# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMONDZA HUNTER, | 1:13-cv-01681-DAD-GSA-PC |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| v. | **(ECF Nos. 40, 41.)** |
| W. WHITE, et al., | |
| Defendants. | **OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS** |

## I.    INTRODUCTION

Demondza Hunter ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action pursuant to 42 U.S.C. § 1983. This case now proceeds with Plaintiff's Third Amended Complaint filed on July 18, 2016, against sole defendant Physician Assistant Clement Ogbuehi ("Defendant"), on Plaintiff's claims for inadequate medical care under the Eighth Amendment.[1] (ECF No. 23.)

---

[1] Plaintiff's only remaining claims are against defendant Clement Ogbuehi, Physician Assistant, for failing to refer Plaintiff to a specialist for treatment, and for improperly prescribing pain medications that caused Plaintiff to suffer internal bleeding, in violation of the Eighth Amendment. All other claims and defendants were dismissed by the court's orders issued on June 17, 2015 (ECF No. 9), March 15, 2016 (ECF No. 18), and June 15, 2016 (ECF No. 22). Plaintiff's claims for retaliation, for state law medical malpractice, for destroying his personal property, for "secondary medical needs," and for labeling him as a "snitch" were dismissed from this action based on Plaintiff's failure to state a claim. (Id.)

Currently before the court are the parties' cross-motions for summary judgment. For the reasons set forth below, the court recommends that Plaintiff's motion for summary judgment be denied, and Defendant's motion for summary judgment be granted.

## II.    PROCEDURAL BACKGROUND

On September 5, 2017, defendant Ogbuehi filed a motion for summary judgment, or in the alternative, for partial summary judgment.[2]  (ECF No. 40.)  On September 11, 2017, Plaintiff filed a cross-motion for partial summary judgment.  (ECF No. 41.)  On September 29, 2017, Defendant filed an opposition to Plaintiff's cross-motion.  (ECF No. 44.)  On November 15, 2017, Plaintiff filed a notice of non-opposition to Defendant's motion. (ECF No. 47.)  On November 17, 2017, Defendant filed objections to Plaintiff's notice of non-opposition, which the court addressed in its May 7, 2018 order. (ECF No. 53.)  The cross-motions are deemed submitted. Local Rule 230(*l*).

## III.    SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

---

[2] On September 5, 2017, Defendant served Plaintiff with the requisite notice of the requirements for opposing the motion for summary judgment.  Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).  (ECF No. 40.)

In resolving cross-motions for summary judgment, the court must consider each party's evidence. Johnson v. Poway Unified School Dist., 658 F.3d 954, 960 (9th Cir. 2011), cert. denied, 132 S.Ct. 1807. Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The court determines only whether there is a genuine issue for trial. Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

Because this court must liberally construe *pro se* pleadings, the arguments and evidence submitted in support of Plaintiff's cross-motion for summary judgment, (ECF No. 41), will be considered in tandem with, and as part of, Plaintiff's opposition to Defendant's motion for summary judgment.

In arriving at these findings and recommendations, the court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this court did not consider the argument, document, paper, or objection. This court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

///

# IV. DEFENDANT'S EVIDENTIARY OBJECTIONS

On September 29, 2017, Defendant filed evidentiary objections to twenty-one of the assertions in Plaintiff's declaration on grounds of relevance, hearsay, misstatement of documents, and lack of personal knowledge.  (ECF No. 43.)

In a motion for summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial."  See Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001).  "Rule 56[(c)] requires only that evidence 'would be admissible', not that it presently be admissible."  Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006); see also Comite de Jornaleros de Redondo Beach, 657 F.3d at 964 n.7 ("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial.")  Thus, "[t]he focus is on the admissibility of the evidence's contents, not its form."  Estate of Hernandez-Rojas ex rel. Hernandez v. United States, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (citing Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 846 (9th Cir. 2004)).

While a court will consider a party's evidentiary objections to a motion for summary judgment, "[o]bjections such as lack of foundation, speculation, hearsay and relevance are duplicative of the summary judgment standard itself."  All Star Seed v. Nationwide Agribusiness Ins. Co., No. 12CV146 L BLM, 2014 WL 1286561, at *16-17 (S.D. Cal. Mar. 31, 2014) (citing Burch, 433 F. Supp. 2d at 1119-20; see also Comite de Jornaleros de Redondo Beach, 657 F.3d at 964 n.7 ("[Rule] 56(c)(2) permits a party to 'object that the material cited to support or dispute a fact *cannot be presented* in a form that would be admissible in evidence' " (quoting Fed. R. Civ. P. 56)).

The court declines to address each of Defendant's objections, and will instead grant or deny an objection as needed for this order. The court finds Defendant's hearsay objections to be "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence," which should be rejected.  Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013) (quoting Doe v. Starbucks, Inc., 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009)).  Thus, the court will address any specific objections

as needed for its ruling on these summary judgment motions. Otherwise, the evidentiary objections are denied as unnecessary to address.

## V. SUMMARY OF ALLEGATIONS IN THE THIRD AMENDED COMPLAINT[3]

Plaintiff is currently incarcerated at the California State Prison–Sacramento in Represa, California. Plaintiff's claims in the operative Third Amended Complaint arose while he was incarcerated at the California Substance Abuse Treatment Facility (SATF) in Corcoran, California. Plaintiff brings Eighth Amendment medical claims against defendant Physician Assistant Clement Ogbuehi, his primary care provider at SATF.

Plaintiff alleges that defendant Ogbuehi denied him access to medical care. From August 25, 2011, through December 12, 2012, Plaintiff repeatedly submitted Health Care Services Request Forms complaining of low back pain, pain in back of his right thigh, right buttock pain, and pinching sensations with walking, numbness, and muscle contractions, all which interfere with his daily activities and sleep at night. From September 8, 2011, through November 8, 2012, defendant Ogbuehi conducted at least six follow-up medical visits concerning Plaintiff's prior spine condition dating back to 1987. Defendant Ogbuehi ignored Plaintiff's pleas to investigate his current complaints. During a visit on April 19, 2012, defendant Ogbuehi told Plaintiff that if he had not snitched on Ogbuehi's co-workers, Ogbuehi would have investigated Plaintiff's medical complaints. Defendant Ogbuehi did not have any training in neurological conditions diagnoses, and there was no available doctor with such training at SATF, so defendant Ogbuehi would have had to complete a referral for services to have a doctor outside of SATF investigate Plaintiff's medical complaints. In addition, on May 30, 2012, defendant Ogbuehi prescribed the medication Naproxen for Plaintiff based on Plaintiff's prior medical condition, notwithstanding that Plaintiff's blood count test disclosed a diagnosis indicative of internal bleeding caused by Naproxen. On August 2, 2012, defendant

---

[3] Plaintiff's Third Amended Complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence. Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004). The summarization of Plaintiff's claim in this section should not be viewed by the parties as a ruling that the allegations are admissible. The court will address, to the extent necessary, the admissibility of Plaintiff's evidence in the sections which follow.

Ogbuehi himself made a diagnosis of "thrombocytopenia," which is internal bleeding caused by Naproxen, but continued to prescribe Naproxen to Plaintiff. (ECF No. 23 at 24:11-15.) On November 8, 2012, defendant Ogbuehi finally stopped the Naproxen due to his diagnosis.

Plaintiff suffered from pain and inability to attend recreational yard activities for more than two years. On December 20, 2013, Dr. Shahram Ehteshami [not a defendant], Neurosurgeon, diagnosed Plaintiff with L3-4 broad disk bulge and L4-5 broad protrusion, causing effect upon the nerve roots. Dr. Eteshami recommended surgery by a qualified doctor. Plaintiff lost full range of motion at the pelvic/right hip, suffered from internal bleeding from May 30, 2012 to November 8, 2012, and was diagnosed and treated for major depression and anxiety. Plaintiff has irreparable neurological damage due to his medical complaints being uninvestigated and untreated for two years. Plaintiff seeks injunctive relief and compensatory damages.

## VI. EIGHTH AMENDMENT MEDICAL CLAIM

While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks omitted), Wilhelm, 680 F.3d at 1122. Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir.

1992), overruled on other grounds by <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997), (citing <u>Shapely v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985)).

"Deliberate indifference is a high legal standard." <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" <u>Id.</u> at 1057 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" <u>Id.</u> (quoting <u>Gibson v. County of Washoe, Nevada</u>, 290 F.3d 1175, 1188 (9th Cir. 2002)). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." <u>Id.</u> at 1060. "[E]ven gross negligence is insufficient to establish a constitutional violation." <u>Id.</u> (citing <u>Wood v. Housewright</u>, 900 F.2d 1332, 1334 (9th Cir. 1990)).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." <u>Franklin v. Oregon</u>, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted). To prevail, a plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

## VII.    DEFENDANT'S UNDISPUTED FACTS (DUF)[4]

Defendant submitted the following facts in support of his motion for summary judgment. (ECF No. 40 at 25-34.)

///

///

---

[4] Plaintiff failed to properly address Defendant's statement of undisputed facts. Local Rule 260(b). Accordingly, the court may consider Defendant's assertions of fact as undisputed for purposes of this motion. <u>Id.</u>; Fed. R. Civ. P. 56(e)(2).

**The Parties**

1.    Plaintiff Demondza Hunter (C-99425) (Plaintiff), was at all relevant times, an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR), incarcerated at the California Substance Abuse Treatment Facility, Corcoran (CSATF).  (Compl. p. 5.)  Plaintiff is currently incarcerated at the California State Prison–Sacramento (CSP-Sacramento).  (Compl. p. 1.)

2.    Defendant is a Physician Assistant and has been licensed to practice in the State of California since February 4, 1999.  He received a Bachelor of Science degree and completed his Physician Assistant training at Charles Drew School of Medicine in Los Angeles, California in 1998, and was certified by the National Commission on Certification of Physician Assistants in 1999.  He received a Doctor of Medicine from the Universidad Central Del Este (UCE), School of Medicine in San Pedro, Dominican Republic in 2009.  (Decl. of Clement Ogbuehi, P.A. (Ogbuehi Decl.) at ¶ 1.)

3.    Defendant was employed as a Physician Assistant by CDCR from April 2011 to August 1, 2017.  From April 2011 to March 2015, he served at California Substance Abuse Treatment Facility and State Prison (SATF State Prison) and from March 2015 to August 1, 2017, he served at Kern Valley State Prison.  (Ogbuehi Decl. at ¶ 2.)

4.    As a P.A. at CSATF, Defendant's responsibilities included providing comprehensive chronic disease condition management (i.e., for diabetes, hypertension, hyperlipidemia, hepatitis C, pain management), immunizations, vaccinations, patient education, preventive care, public health exams, wound care, incision/drainage, suturing, pain management and physical exams to the inmate population.  His job duties included reviewing medical records, instructing nurses and other medical staff, as well as providing direct medical care to inmates under physician supervision pursuant to the Delegation of

Service Agreement. He has examined and treated dozens of patients with the medical conditions and diagnoses related to internal bleeding and spine injuries. (Ogbuehi Decl. at ¶ 2.)

5. As a Staff Physician Assistant for CDCR, Defendant is familiar with the standard of care as it applies to Physician Assistants providing medical care and treatment to inmates in the California prison system. (Ogbuehi Decl. at ¶ 3.)

6. According to his review of Plaintiff's medical records, the first time Defendant saw Plaintiff for a medical visit was September 8, 2011. He does not recall seeing or treating Plaintiff prior to September 8, 2011. Contemporaneous with seeing Plaintiff for that first medical visit, either just before he came into the examining room or at the same time, Defendant reviewed the medical records available to him. (Ogbuehi Decl. at ¶ 7.)

**Plaintiff's Claim Re Referral To Specialist**

7. Based on his review of Plaintiff's medical records, on September 8, 2011, Defendant understood Plaintiff was in a car accident in 1987 when he fell asleep at the wheel and went off the embankment. At that time, Plaintiff had a Harrington rod placed in his upper lumbar thoracic spine due to fracture of the spine element and also a repair of the upper portion of the femur on the right side. On December 26, 2003, Dr. Friedman conducted a musculoskeletal and neurological examination. Plaintiff was seen for chronic pain complaints and Dr. Friedman felt it was ligamentous in origin with no neurological deficits noted. (Ogbuehi Decl. at ¶ 8; Exhibit A: Consultation by Jack Friedman, M.D., 12/26/03.)

8. Plaintiff had a CT scan on July 10, 2003. According to Dr. Friedman's December 26, 2003 Consultation Report, the salient points being an "annulus bulge at L5 through S1 per surgical deformity of lamella at L 3/4 and Harrington rod T9 through Tl2 and disc narrowing T12 through L1." (Exhibit A:

///

Consultation by Jack Friedman, M.D., 12/26/03.)  No acute changes were noted in Plaintiff's condition.

9.    Plaintiff had a MRI of his cervical spine on February 18, 2009.  According to Dr. Mario Deguschi's MRI Report there was an indication of posttraumatic arthritis, reversal of the cervical lordosis which simply means the patient was tensing his muscles, mild degenerative disc disease, minimal disc bulges without herniation and mild spinal stenosis, but no acute changes were noted in Plaintiff's condition.  (Ogbuehi Decl. at ¶ 10; Exhibit B: Report re MRI of Cervical Spine, 02/18/09.)

10.    Plaintiff had an x-ray of the lumbar spine, with four views, on October 25, 2010 that was ordered by Dr. Kokor.  According to Dr. Muhammad Chaudhri's October 26, 2010, Report, there was no evidence of hardware failure and moderate degenerative changes were seen throughout lumbar spine.  Dr. Chaudhri noted that if clinically concerned a complete L spine with oblique view could be obtained or if an examination indicated an injury an L spine CT could be obtained.  No acute changes were noted in Plaintiff's condition. (Ogbuehi Decl. at ¶ 11; Exhibit C:  Three Views of the Lumbar Spine Report, 10/26/10.)

11.    Plaintiff had a CT of the lumbar spine on February 4, 2011.  Dr. Benjamin Seligman's February 4, 2011 Radiology Interpretation Report noted Harrington rods and a healed L2 compression fracture, disc disease at L1-2, and no acute changes.    (Ogbuehi Decl. at ¶ 12; Exhibit D: Radiology Interpretation, 02/04/11.)

12.    Plaintiff had an x-ray of the lumbar spine, with three views, on March 2, 2012 that was ordered by me.  Dr. Tony Deeths compared the x-rays taken on March 2, 2012 with the x-rays taken on October 25, 2010.  In his report dated March 7, 2012, Dr. Deeths found there was no change and no acute abnormality.

///

(Ogbuehi Decl. at ¶ 13; Exhibit: X-ray Lumbar Spine Three Views Report, 3/7/12.)

13. After Defendant stopped treating Plaintiff, Dr. Robert Scharffenberg ordered an x-ray of the lumbar spine, with three views, of Plaintiff on March 19, 2013. Dr. Mark Williams compared the x-rays taken on March 19, 2013 with the x-rays taken on March 2, 2012. In his report dated March 25, 2013, Dr. Williams found "no changes are seen over interval." (Ogbuehi Dec. at ¶ 14; Exhibit F: X-ray Lumbar Spine Three Views Report, 03/25/13.)

14. Based on his review of the medical records, Defendant encountered Plaintiff on September 8, 2011, November 10, 2011, February 9, 2012, April 19, 2012, August 2, 2012, and September 6, 2012. Several times, Plaintiff refused to meet with Defendant even though an appointment was scheduled. Defendant's encounters with Mr. Hunter, generally included discussions regarding his complaints, and other pertinent issues, such as medications, lab results, allergies, immunizations, imaging studies, medical history, referrals, and patient education regarding his condition. These encounters would also generally include a review of his musculoskeletal system, including a review of Plaintiff's range of motion, ambulation, gait, muscular atrophy, swelling and the presence of crepitus. In these encounters, Defendant would also generally evaluate Plaintiff's neurological orientation. (Exhibit G-1: Medical Progress Note, 9/8/11; Exhibit G-2: Medical Progress Note, 11/10/11; Exhibit G-3: Medical Progress Note 2/9/12; Exhibit G-4: Medical Progress Note, 4/9/12; Exhibit G-5: Primary Provider Progress Note 8/2/12; and Exhibit G-6: Primary Provider Progress Note, 9/16/12.) (Ogbuehi Decl. at ¶ 15.)

15. Based on his medical education, training and experience, his findings from his observations and physical examinations of Plaintiff, as well as my review of his medical records and CDCR policies and procedures on pain management, it was Defendant's medical opinion then and it is now that there were no acute changes

in Plaintiff's condition during the time Defendant treated him. (Ogbuehi Decl. at ¶ 16.)

16. Based on his medical education, training and experience, his findings from his observations and physical examinations of Plaintiff, as well as review of his medical records and CDCR policies and procedures on pain management, it was Defendant's medical opinion then and it is now that Plaintiff did not have a medical condition that warranted a referral to an outside specialist during the time Defendant treated him. The medical care and treatment Defendant provided to Plaintiff was well within the standard of care applicable to medical professionals and was medically appropriate. (Ogbuehi Decl. at ¶ 17.)

**PLAINTIFF'S CLAIM RE NAPROXEN**

17. On October 17, 2008, Dr. S. Raman prescribed Naproxen to Plaintiff for 60 days for knee pain. There were no reported ill effects. (Ogbuehi Decl. at ¶ 18; Exhibit H: Medication Reconciliation, 10/17/08.)

18. On September 8, 2011, Defendant prescribed Naproxen to Plaintiff. Plaintiff was prescribed 500 mg twice a day as necessary. (Exhibit I: Medical Progress Note, 9/8/11.) Naproxen belongs to a class of drugs called non-steroidal, anti-inflammatory drugs [NSAIDs] which are used to reduce pain and inflammation. In Plaintiff's case, Defendant prescribed Naproxen to reduce pain after Plaintiff repeatedly refused to take other pain medications. (Exhibit J: Refusals.) Prescribing Naproxen to Plaintiff was consistent with CDCR pain management policies and procedures. Naproxen is a keep on person [KOP] drug that inmates keep on their person. (Ogbuehi Decl. at ¶ 19.)

19. During the time Defendant treated and examined Plaintiff, including the time he was prescribed Naproxen, Defendant closely monitored Plaintiff's condition for physical signs or symptoms of internal bleeding. (Ogbuehi Decl. at ¶ 20.)

20. On November 10, 2011, Plaintiff complained about hard stools but stated there was no blood in his stool, no abdominal pain, no nausea, no vomiting, and no

indications of internal bleeding. (Ogbuehi Decl. at ¶ 21; Exhibit K: Medical Progress Note, 11/10/11.)

21. On March 6, 2012, Plaintiff had a blood test which showed a platelet level of 231,000 which was within normal limits. In addition, Plaintiff's hemoglobin and hematocrit results were both within normal limits and indicated no anemia. (Exhibit L: Lab Result, 3/6/12.) Once again, Plaintiff did not report internal bleeding. (Ogbuehi Decl. at ¶ 22.)

22. On April 19, 2012, Plaintiff complained of constipation, he denied nausea, vomiting and abdominal pain, except "seeing some tinge of blood in stool." At this time, Defendant also reviewed the March 6, 2012 blood tests referenced above which indicated normal platelet, hemoglobin and hematocrit levels. Plaintiff was given a fecal occult blood test which was negative for blood in the stool. Plaintiff was also given three more occult blood test cards to turn in as a follow up, which were all negative for blood in the stool as well. (Ogbuehi Decl. at ¶ 23; Exhibit M: Medical Progress Note, 4/19/12; Exhibit N: Lab Result, 4/27/12.)

23. On May 29, 2012, Plaintiff had a blood test that showed a platelet count of 40,000 which could indicate low platelets (thrombocytopenia) or lab error. Plaintiff's hemoglobin and hematocrit results were again both within normal limits suggesting no anemia. (Exhibit O: CSATF/SP LAB, 5/29/12). Plaintiff did not have any signs or symptoms of internal bleeding, and it would be extremely rare for an individual's platelet level to drop from 231,000 to 40,000 in less than three months, especially in the absence of anemia or any physical signs of bleeding, and no detection of occult blood in the April 17, 2012 test. Defendant suspected the May 29, 2012 platelet count of 40,000 may have been the result of lab error. (Ogbuehi Decl. at ¶ 24.)

24. Defendant saw Plaintiff on August 2, 2012. There was no indication of bleeding. Because I questioned the accuracy of the May 29, 2012 blood test, I

re-ordered a complete blood count. Plaintiff refused to take the blood tests. (Exhibit P: Primary Care Provider Progress Note, 8/2/12; Exhibit Q: Primary Care Provider Progress Note, 8/9/12 [referencing August 2, 2012 visit].) The reference to "thrombocytopenia" in the Primary Care Provider Note for August 2, 2012 refers to the May 29, 2012 blood test. (Ogbuehi Decl. at ¶ 25.)

25. Defendant saw Plaintiff on August 9, 2012. At this encounter, Plaintiff refused to be examined. Again, there was no indication of bleeding. Plaintiff showed no apparent distress, was well nourished and well developed. Plaintiff agreed to go to lab and Defendant instructed the nurse to stop crushing the Oxcarbazepine as Plaintiff requested. Defendant re-ordered the lab tests. (Ogbuehi Decl. at ¶ 26; Exhibit Q; Primary Care Provider Progress Note, 8/9/12.)

26. On August 16 through 18, 2012, Plaintiff refused his medication. On August 17, 2012, Plaintiff was referred to Mental Health because he refused his medications. There was no indication Plaintiff was suffering from internal bleeding. (Ogbuehi Decl. at ¶ 27; Exhibit R: Physician's Order, 8/16/12; CDC 128c, 8/16/12 and 8/22/12.)

27. On September 6, 2012, Defendant stopped the Naproxen prescription because Plaintiff refused to take blood tests that would verify whether or not that low platelet count was real and if so would have placed him at a relatively increased risk of suffering from internal bleeding. (Ogbuehi Decl. at ¶ 28; Exhibit S: Primary Care Provider Progress Note, 9/6/12.)

28. In all his encounters with Plaintiff, Defendant did not see any physical sign of internal bleeding, and Plaintiff did not make any complaint that indicated that he was suffering from internal bleeding. (Ogbuehi Decl. at ¶ 29.)

29. On November 20, 2012, Plaintiff agreed to a blood test which showed a platelet level of 239,000 which was within normal limits. (Ogbuehi Decl. at ¶ 30; Exhibit T: Lab Report, 11/20/12.)

///

30. Platelet clumping is an in-vitro sampling problem which may mislead to a diagnosis to thrombocytopenia. This phenomenon occurs when the anticoagulant used while testing the blood sample causes the clumping of platelets which mimics a low platelet count. (Ogbuehi Decl. at ¶ 31.)

31. Based on his medical education, training and experience, his findings from his observations and physical examinations of Plaintiff, as well as review of his medical records, it was Defendant's medical opinion then and it is now that on May 29, 2012, Plaintiff was not suffering from thrombocytopenia. Defendant bases this conclusion on the following. First, Defendant closely monitored Plaintiff's condition for physical signs or symptoms of internal bleeding. He never exhibited any such signs or symptoms and he made no complaints of bleeding. On April 19, 2012, Plaintiff complained of "seeing some tinge of blood in stool." At this time, Plaintiff was given a fecal occult blood test which was negative for blood in the stool. On April 27, 2012, repeat tests did not detect any occult blood in the stools on three cards. Second, in his encounters with Plaintiff, Defendant did not make any complaints that he was bleeding. Third, other test results did not indicate internal bleeding. On March 6, 2012, Plaintiff had a blood test which showed a platelet level of 231,000 which was within normal limits and does not indicate internal bleeding. It would be extremely rare for an individual's platelet level to drop from 231,000 to 40,000 in less than three months, especially in the absence of any physical signs of internal bleeding. Plaintiff's hemoglobin and hematocrit tests, taken on March 6, 2012, as well as the very same blood draw on May 29, 2012, were all within normal limits and indicated no internal bleeding. On April 27, 2012, blood tests did not detect any occult blood. On November 20, 2012, a blood test showed a platelet level of 239,000 which was within normal limits. Based on his medical education, training and experience, his findings from his observations and physical examination of Plaintiff, as well as review of his medical records, it

was Defendant's medical opinion then and it is now that Plaintiff's May 29, 2012 platelet count was attributable to platelet clumping or other lab error. (Ogbuehi Decl. at ¶ 32.)

32. Based on his medical education, training and experience, my findings from my observations and physical examinations of Plaintiff, as well as review of his medical records, it was Defendant's medical opinion then and it is now that the benefit of continuing to prescribe Naproxen to Plaintiff outweighed the risks of potential side effects since he had no sign or symptoms of internal bleeding and there was only one test result that indicated a low platelet count and he refused to take other pain medications but never refused to take Naproxen. Accordingly, on May 29, 2012, Defendant continued to prescribe Naproxen to Plaintiff. The medical care and treatment Defendant provided to Plaintiff was well within the standard of care applicable to medical professionals and was medically appropriate. (Ogbuehi Decl. at ¶ 33.)

33. Defendant did not act with any intent to deliberately or in any other way disregard Plaintiff's medical needs or medical conditions. At no time did Defendant knowingly or intentionally cause Plaintiff to experience any pain, suffering or injury of any kind. (Ogbuehi Decl. at ¶ 34.)

## VIII. DEFENDANT'S ARGUMENTS

Defendant's evidence includes Plaintiff's allegations in the Third Amended Complaint, defendant P.A. Ogbuehi's declaration, and Plaintiff's medical records. Defendant argues that Plaintiff cannot establish that Defendant acted with deliberate indifference, as required to meet the burden under the Eight Amendment.

### A. <u>Failure to Refer Plaintiff to Specialist</u>

Defendant first argues that he was not deliberately indifferent by failing to refer Plaintiff to a specialist for his back pain.

Defendant offers evidence that there were no acute changes in Plaintiff's condition during the time Defendant treated him to warrant referring him to a specialist. In 1987, as a

result of a car accident, Plaintiff had a Harrington rod placed in his upper lumbar thoracic spine due to a fracture of spine element and also a repair of the upper portion of the femur on the right side.  (DUF 7; Ogbuehi Decl. at ¶ 8.)  Plaintiff had a CT scan on July 10, 2003.  (DUF 8; Exh. A: Consultation by Jack Friedman, M.D., 12/26/03.)   According to Dr. Friedman's December 26, 2003, report, no acute changes were noted in Plaintiff's condition.  (Id.; DUF 12; Ogbuehi Decl. at ¶ 13, Exh. E: X-ray Lumbar Spine Three Views Report, 3/7/12; DUF 13; Ogbuehi Decl. at ¶ 14, Exh F: X-ray Lumber Spine Three Views Report, 3/25/13; DUF 14; Ogbuehi Decl. at ¶ 15, Exh. G-1: Medical Progress Note, 9/8/11; Exh. G-2: Medical Progress Note, 11/10/11; Exh. G-3: Medical Progress Note, 2/9/12; Exh. G-4: Medical Progress Note, 4/9/12; Exh. G-5: Medical Progress Note, 8/2/12; and Exh. G-6: Medical Progress Note, 9/6/12.)  While an inmate, Plaintiff received numerous x-rays, CT scans, and MRIs of his back, including an MRI of his cervical spine on February 18, 2009, an x-ray of the lumbar spine on October 25, 2010, a CT of the lumbar spine on February 4, 2011, an x-ray of the lumbar spine on March 2, 2012, and an x-ray of the lumbar spine on March 19, 2013.  (DUF 9; Ogbuehi Decl. at ¶ 10, Exh. B: Report re MRI of Cervical Spine, 02/18/09; DUF 10; Ogbuehi Decl. at ¶ 10, Exh, C: Three Views of the Lumbar Spine Report, 10/26/10; DUF 11; Ogbuehi Decl. at ¶ 12, Exh. D: Radiology Interpretation 02/04/11; DUF ¶ 12; Ogbuehi Decl. at ¶ 13, Exh. E: X-ray Lumbar Spine Three Views Report, 3/7/12; DUF ¶ 13; Ogbuehi Decl. at ¶ 14: Exh. F: X-ray Lumbar Spine Three Views Report, 03/25/13.)  No acute changes were found in any of these imaging studies.  (Id.)

Based on P.A. Ogbuehi's medical education, training and experience, his findings from his observations and physical examinations of Plaintiff, as well as his review of Plaintiff's medical records and CDCR policies and procedures on pain management, it was P.A. Ogbuehi's medical opinion that there were no acute changes in Plaintiff's medical condition and Plaintiff did not have a medical condition that warranted a referral to an outside specialist during the time he treated him.  (DUF 15-16; Ogbuehi Decl. at ¶¶ 16, 17.)

///

///

### B. Continuing to Prescribe Naproxen for Plaintiff

Defendant also argues that he was not deliberately indifferent by prescribing Naproxen to Plaintiff. Plaintiff alleges that Defendant was deliberately indifferent because on May 30, 2012, he continued to prescribe Naproxen after test results showed "platelets markedly reduced," which is indicative of internal bleeding or thrombocytopenia. (Third Amended Comp., ECF No. 23 at 24:4-11.) Plaintiff claims he suffered internal bleeding based on a May 29, 2012 blood test that showed a markedly reduced level of platelets, which could indicate thrombocytopenia or internal bleeding. (Id. at 24 ¶ 4.)

Based on his observations and physical examinations of Plaintiff, as well as his review of Plaintiff's medical records, including numerous blood tests, it was P.A. Ogbuehi's medical opinion that Plaintiff did not suffer from internal bleeding. (DUF 31; Ogbuehi Decl. at ¶ 32.) P.A. Ogbuehi based this conclusion on several factors.

First, P.A. Ogbuehi closely monitored Plaintiff's condition for physical signs or symptoms or internal bleeding. (DUF 19; Ogbuehi Decl. at ¶ 20.) Plaintiff never exhibited any such signs or symptoms and he made no complaints of bleeding. (DUF 28; Ogbuehi Decl. at ¶¶ 20, 29.) On April 19, 2012, Plaintiff complained of "seeing some tinge of blood in stool." (DUF 22; Ogbuehi Decl. at ¶23, Exh. M: Medical Progress Note, 4/19/12.) At this time, Plaintiff was given a fecal occult blood test which was negative. (Id., Exh. N: Lab Result, 4/27/12.) Plaintiff was also given three occult blood test cards as a follow up which were all negative for blood in the stool. (Id.)

Second, other test results did not indicate internal bleeding. On March 6, 2012, Plaintiff had a blood test which showed a platelet level of 231,000 which was within normal limits and does not indicate internal bleeding. (DUF 21; Ogbuehi Decl. at ¶ 22; Exhibit L: Lab Result.) Defendant declares that it would be extremely rare for an individual's platelet level to drop from 213,000 to 40,000 in less than three months, especially in the absence of any physical signs of internal bleeding. (DUF 31; Ogbuehi Decl., at ¶ 32.) On April 27, 2012, blood tests did not detect any occult blood. (DUF 23; Exhibit N: Lab Result, 4/27/12.) On November 20,

2012, a blood test showed Plaintiff's platelet level at 239,000, which was within normal limits. (DUF 29; Ogbuehi Decl. at ¶ 30; Exhibit T: Lab Report, 11/20/12.)

Plaintiff alleges that on September 6, 2012, Defendant stopped the Naproxen prescription because of Defendant's diagnosis that Plaintiff had thrombocytopenia. Defendant offers evidence that he stopped the prescription because Plaintiff refused to take a blood test that would verify whether or not he was suffering from internal bleeding. (DUF 27; Ogbuehi Decl. at ¶ 28, Exhibit S: Primary Care Provider Progress Note, 9/6/12.)

Based on his medical education, training and experience, his findings from his observations and physical examination of Plaintiff, as well as review of his medical records, Defendant states that it was his medical opinion that the benefit of continuing to prescribe Naproxen to Plaintiff outweighed the risks of potential side effects since he had no sign or symptoms of internal bleeding and there was only one test result that indicated a low platelet count, and Plaintiff refused to take other pain medications but never refused to take Naproxen. (DUF 32; Ogbuehi Decl. at ¶ 34.)

Defendant argues that he provided Plaintiff with reasonable and appropriate care, which was consistent with the community standard of care and CDCR policies and procedures. There is no evidence which suggests that P.A. Ogbuehi's treatment of Plaintiff constitutes acting with deliberate indifference to plaintiff's serious medical needs.

## IX.    DEFENDANT'S BURDEN

Based on Defendant's arguments and evidence in support of his motion for summary judgment, the court finds that Defendant has met his burden of demonstrating that he did not act with deliberate indifference to Plaintiff's serious medical needs. Therefore, the burden now shifts to Plaintiff to produce evidence of a genuine material fact in dispute that would affect the final determination in this case.

///

///

///

///

## X. PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS (SUF)[5]

Plaintiff submitted the following undisputed facts in support of his motion. (ECF No. 41 at 19-26.)

1. That alleged events giving rise to cause of action against Defendant Clement Ogbuehi (defendant) for failure to investigate or reasonably respond to Plaintiff Demondza Hunter['s] (plaintiff) spinal injuries separate from his prior medical [spinal] condition and "thrombocytopenia" proximately caused by [the] medication Naproxen; occurred between August 25, 2011 and December 02, 2012 at California Substance Abuse Treatment Facility and State Prison (SATF). See, Plaintiff's Declaration (Declr.), at ¶ 3; see Exhibit (Ex.) A, [Defendant's] Response to Plaintiff's First Set of Request for Admissions (DRPFSRA) No. 1.

2. That plaintiff exhausted available administrative remedies as it relates to defendant's failure to investigate or reasonably respond to plaintiff's spinal injuries separate from [his] prior medical [spinal] condition. Declr., at ¶ 4; Ex. A, at DRPFSRA Nos. 3, 5, 7, 9 and 11. cf. Ex. B, defendant's counsel letter dated 6-20-17 re agreed to stipulate to the authenticity of documents as it relates to DRPFSRA Nos. 3, 5, 7, 9, and 11; also see, Ex. D, [Defendant's] Response to Plaintiff's First Set of Interrogatories (DRPFSI), No. 14.

3. That plaintiff timely filed this § 1983 action pursuant to [the] applicable statute of limitation. Declr., at ¶ 5; Ex. A, DRPFSRA, No. 21; also see, Ex. D, DRPFSI, No. 14.

4. That defendant was [the] primary care provider responsible for plaintiff's access to medical care. Declr., at ¶ 6; Ex. A, DRPFSRA, No. 58.

///

---

[5] Defendant disputes fourteen of Plaintiff's seventeen undisputed facts, arguing that Plaintiff's evidence does not reflect the alleged facts, the alleged facts do not support Plaintiff's claims, and/or the facts are inadmissible. (ECF No. 43.) However, Defendant did not dispute the facts themselves.

5.     That on at least six (6) separate and independent occasions plaintiff requested medical attention concerning spinal injuries separate from his prior medical [spinal] condition. <u>Declr.</u>, at ¶ 7; Ex. A, DRPFSRA, Nos. 23-24, 26, 28, 30, 32 and 34.

6.     That on at least four (4) separate and independent occasions various Registered Nurses made referrals to defendant for evaluation and treatment of plaintiff's spinal injuries separate from [his] prior medical [spinal] condition. <u>Declr.</u>, at ¶ 8; Ex. A, DRPFSRA, Nos. 36-37, 39, 41 and 43; <u>also see</u>, Ex. C, Amended [Defendant's] Response to Plaintiff's First Set of Request for Admissions . . . (Amended –DRPFSRA), Nos. 37, 39, 41 and 43.

7.     That during an additional seven (7) separate and independent occasions during primary care provider visits plaintiff personally requested defendant to investigate his spinal injuries separate from [his] prior medical [spinal] condition. <u>Declr.</u>, at ¶ 9; Ex. A, DRPFSRA, Nos. 58-59, 61, 63, 65, 67, 69, 71, 73, 75, and 77; <u>also see</u> Ex. C, Amended-DRPFSRA, Nos. 59, 61, 63, 65, 67, 69, 71, 73, 75, and 77.

8.     That at the earliest, on September 8, 2011, defendant actually had knowledge of plaintiff's prior medical [spinal] condition that included harrington rods, and a compression fracture. <u>Declr.</u>, at ¶ 10; Ex. C, Amended-DRPFSRA, No. 59. That the harrington rods were from spine surgery-1987 and [the] compression fracture occurred in 2010. Ex. C, Amended-DRPFSRA, No. 37. That the latter was detected by CT-scan on February 04, 2011, <u>id.</u>, following the October 25, 2010 x-ray w/four views failure in detecting [the] same compression fracture. Ex. A, DRPFSRA, Nos. 45-46, 48 and 52; <u>also see</u> Ex. C, Amended-DRPFSRA, Nos. 46, 48 and 52. And, that as of November 23, 2010 [the] Physical Therapist reported that plaintiff had been able to perform all exercises and [no] longer needed any therapy. Ex. E, [Defendant's] Response to Plaintiff's Second Set of Request for Admissions (DRPSSRA), No. 89(b) and Document X, CDC Form

7243 date of consultation by Physical Therapist David G. Ayers; also see Ex. F, Amended [Defendant's] Response to Plaintiff's Second Set of Request for Admissions (Amended-DRPSSRA), No. 89.

9.   That on September 08, 2011, defendant conducted primary care provider's visits in response to a referral made on August 30, 2011 by [a] Registered Nurse who responded to my request, on August 25, 2011, for medical attention regarding spinal injuries separate from my prior medical [spinal] condition. Declr., at ¶ 11; Ex. A, DRPFSRA, Nos. 23(a)-24, 36(a)-37, 58(a)-59; Ex.C, Amended-DRPFSRA, Nos. 37 and 59. Defendant disregarded and failed to investigate my complaints of [electric jolts] jumpiness/jerking and heat sensations from plaintiff's lower back down his legs. The defendant simply made note of plaintiff's prior medical [spinal] condition and prescribed the medication Naproxen. Ex. A, DRPFSRA, Nos. 59 and 61; Ex.C , Amended-DRPFSRA, Nos. 59 and 61.

10.  That on November 10, 2011, defendant conducted primary care provider's visits in response to [a] referral made on October 19, 2011 by [a] Registered Nurse who responded to plaintiff's request, on October 19, 2011, for medical attention regarding spinal injuries separate from his prior medical [spinal] condition. Declr., at ¶ 12; Ex. A, DRPFSRA, Nos. 23(b), 26, 36(b), 39, 58(b) and 63; Ex.C, Amended-DRPFSRA, Nos. 39 and 63. Defendant disregarded and failed to investigate plaintiff's complaints of electric-like jolts/shocks and sleepless nights. Defendant simply made note of plaintiff's prior medical [spinal] condition, continued to prescribe the medication Naproxen and recommended that plaintiff do therapy. Ex. A, DRPFSRA, No. 65; Ex.C, Amended-DRPFSRA, No. 65.

11.  That on December 08, 2011, defendant disregarded his previous recommendation of therapy as it relates to plaintiff's prior medical [spinal] condition described in the preceding paragraph, and was prompt[ed] by an

unidentified staff [member] who directed defendant to update medical chronos [related] to plaintiff's prior medical [spinal] condition. <u>Declr.</u>, at ¶ 13; Ex. A, DRPFSRA, No. 67; <u>also</u> <u>see</u>: Ex. C, Amended DRPFSRA, No. 67. Defendant initiated and completed various medical forms reporting that plaintiff's prior medical [spinal] condition improved and rescinded [the] accommodations cane and extra mattress. Ex. E, DRPSSRA, No. 88 [Document-IX]; <u>also</u> <u>see</u> Ex. F; Amended DRPSSRA, No. 88. However, in response to discovery requests, defendant claims he do[es] not remember the identity of [the] staff who directed him to update medical chronos [related] to plaintiff's prior medical [spinal] condition. Ex. D, DRPFSI, No. 3. Nevertheless, when requested again defendant simply failed to answer or produce documents showing a basis for initiating and completing medical forms reporting that plaintiff's prior medical [spinal] condition improved. Ex. G, [Defendant's] Response to Plaintiff's Second Set of Interrogatories (DRPSSI, No. 18;[6] <u>also</u> <u>see</u>: Ex. H, [Defendant's] Response to Plaintiff's Second Set of Request for Production of Document (DRPSSRPD), No. 10.[7]

12. That on February 09, 2012, defendant conducted primary care provider's visits in response to [a] referral made on February 06, 2012 by the Registered Nurse who responded to plaintiff's request, on February 01, 2012, for medical attention regarding spinal injuries separate from [his] prior medical [spinal] condition. <u>Declr.</u>, at ¶ 14; Ex. A, DRPFSRA, Nos. 23(c), 28, 36(c), 58(d)-(e), 69, 70; <u>also</u> <u>see</u>: Exh. C, Amended DRPFSRA, 36(c), 41, 58(d)-(e), 69 and 70. Defendant disregarded and failed to investigate plaintiff's complaints of having compounded spinal injuries separate from his prior medical [spinal] condition. Defendant simply made note of plaintiff's prior medical [spinal] condition,

---

[6] On July 19, 2017, [Plaintiff] filed [a] motion to compel ordering defendant to identify and/or produce document in response to this request.

[7] <u>Id.</u>

restated his action on December 08, 2011 when he reported improvement of plaintiff's prior medical [spinal] condition and rescinded [Plaintiff's] cane and extra mattress but changed [the] basis from plaintiff attacked his roommate with a pin to plaintiff allegedly attacked his roommate with the cane. Ex.-A. DRPFSRA, No. 69; also see Ex. C, Amended-DRPFSRA, No. 69. Then, defendant noted [plaintiff's] prior medical [spinal] condition, continued [the] prescription medication Naproxen, and ordered x-rays that were performed on March 02, 2012 to check for severity of [plaintiff's] prior medical [spinal] condition. Ex.-A. DRPFSRA, No. 71; also see Ex. C, Amended-DRPFSRA, No. 71. However, when defendant ordered that x-rays be performed with three views in comparison to the October 25, 2010 x-rays w/four views conducted by Radiologist Dr. Chaudhri (Radiologist), defendant disregarded [the] Radiologist's "notice" that [un]less x-rays with oblique five views or [a] CT-scan [were used,] plaintiff's prior medical [2010 compression fracture] condition could not be radiologically obtained on film. Ex.-A. DRPFSRA, Nos. 45(a)-(c), 46, 48, 52, 54; also see Ex. C, Amended-DRPFSRA, Nos. 46, 48, 52 and 54. That is because the October 25, 2010 x-ray with four views could not detect plaintiff's 2010 spinal compressions fracture and, based on the Radiologist "notice," the February 04, 2011 CT-scan was performed and detected plaintiff's 2010 spinal compression fracture. Id. This information was well documented as part of plaintiff's prior medical [spinal] condition, which defendant acknowledged having had actual knowledge of as it relates to plaintiff's prior medical [spinal] condition. See, ¶ 10, supra. Nevertheless, defendant disregarded Physical Therapist Ayers' "notice" that plaintiff's range of motion was not within normal limits and that due to weakness plaintiff was unable to perform exercises on December 09, 2011. Ex.-E. DRPSSRA, No. 89 [Document-X]; also see Ex. F, Amended-DRPSSRA, No. 89. That is because defendant repeatedly reported that plaintiff's range of motion was within normal

limits on December 08, 2011 and February 09, 2012. Ex.-A. DRPFSRA, Nos. 67, 69 and 71; also see Ex. C, Amended-DRPFSRA, Nos. 67, 69 and 71. And, when requested defendant simply failed to state his contentions as it relates to the Radiologist's "notice." Ex. G, DRPSSI, No. 17.[8]

13. That on April 19, 2012, defendant conducted primary care provider's visits as follow-up, but disregarded and failed to investigate plaintiff's verbal complaints of spinal injuries separate from [his] prior medical [spinal] condition. Declr., at ¶ 15; Ex. A, DRPFSRA, No. 58(f). Defendant simply stated that plaintiff never admit[ted the] medication Naproxen is helping plaintiff and continued [the] prescription medication Naproxen. Ex.-A. DRPFSRA, No. 73; also see Ex. C, Amended-DRPFSRA, Nos. 73.

14. That on May 29, 2012, defendant received and disregarded Pathologist Dr. Volt's (Pathologist) "notice" that plaintiff's platelets [were] abnormal and markedly reduced, when defendant failed to stop [the] prescription medication Naproxen. Declr. at ¶ 16; Ex.-A. DRPFSRA, Nos. 45(d) and 56; also see Ex. C, Amended-DRPFSRA, No. 56. On August 02, 2012, defendant again disregarded the before-mentioned Pathologist's "notice" notwithstanding defendant having diagnosed plaintiff as suffering from "thrombocytopenia" based on said "notice," yet defendant continued the prescription medication Naproxen. Ex.-A, DRPFSRA, No. 75; also see Ex. C, Amended-DRPFSRA, No. 75. Nevertheless, defendant did not stop [the] medication Naproxen until November 08, 2012 due to [the] diagnosis "thrombocytopenia." Ex.-A, DRPFSRA, Nos. 58(h) and 77; also see Ex. C, Amended-DRPFSRA, No. 77.

15. That on August 02, 2012, defendant conducted primary care provider's visits in response to plaintiff's request, on July 31, 2012, for medical attention regarding plaintiff's spinal injuries separate from [his] prior medical [spinal] condition.

---

[8] On July 19, 2017, [Plaintiff] filed a motion to compel ordering defendant to properly respond to "contention interrogatory."

Declr., at ¶ 17; Ex.-A, DRPFSRA, Nos. 23(d), 30, 58(g) and 75; also see Ex. C, Amended-DRPFSRA, No. 75. Defendant simply continued [the] prescription medication Naproxen. Ex.-A, DRPFSRA, No. 75; also see: [Ex. C,] Amended-DRPFSRA, No. 75.

16.     That on November 8, 2012, defendant conducted primary care provider's visits in response to his having made diagnosis "thrombocytopenia" proximately caused by [the] medication Naproxen, however, defendant disregarded and failed to investigate plaintiff's verbal complaints of spinal injuries separate from [his] prior medical [spinal] condition. Declr., at ¶ 18; Ex.-A, DRPFSRA, Nos. 58(h) and 77; Ex. C, Amended-DRPFSRA, No. 77. Defendant simply stopped the prescription medication Naproxen based on defendant having made [a] diagnosis of "thrombocytopenia" as it relates to plaintiff. Exh. A, DRPFSRA, No. 77; Ex. C, Amended-DRPFSRA, No. 77.

17.     As [a] result, plaintiff's spinal injuries separate from [his] prior medical [spinal] condition were not diagnosed until November 2013 and requir[ed] surgery, i.e., the instrumentation at the lumbosacral column, as well as fusion and decompression at that segment. Declr., at ¶ 19; DRPFSRA, Nos. 79(a)-(c), 80, 82 and 84; Ex. C, Amended-DRPFSRA, Nos. 80, 82 and 84.

## XI.    ANALYSIS

Plaintiff's evidence consists of his allegations in the Third Amended Complaint, Plaintiff's declaration, Defendant's responses to Plaintiff's requests for admissions, Defendant's responses to Plaintiff's interrogatories, Defendant's responses to Plaintiff's request for production of documents, and Plaintiff's medical records.

### A.    Medical Claim Against P.A. Ogbuehi

#### 1.    Objective Element – Existence of Serious Medical Need

A "serious medical need" exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." McGuckin, 974 F.2d at 1059. Here, there is no dispute that Plaintiff presented with a serious medical need.

Plaintiff alleges in the Third Amended Complaint that he suffered from low back pain and other pain related to a spinal condition. (ECF No. 23 at 22 ¶ 2.) Defendant does not dispute that Plaintiff suffered from pain or presented with complaints of low back pain, pain in the back of his right thigh, right buttock pain, and pinching sensations with walking, numbness, and muscle contractions. Failure to treat Plaintiff's pain could result in the unnecessary and wanton infliction of pain. Therefore, Plaintiff meets the first prong of the test for deliberate indifference.

### 2.    Subjective Element – Deliberate Indifference

Plaintiff proceeds on claims that defendant P.A. Igbuehi was deliberately indifferent to his serious medical needs because Defendant failed to refer Plaintiff to a specialist for his spinal condition, and because Defendant prescribed pain medication to Plaintiff that caused internal bleeding.

### i.    Failure to Refer to Specialist

The parties do not dispute that Defendant knew about Plaintiff's medical history and symptoms. Plaintiff asserts that Defendant knew about his condition because between August 25, 2011 through December 12, 2012, Plaintiff submitted at least eight Health Care Services Request Forms upon which he listed his symptoms (Pltf's Decl. ¶ 7); Registered Nurses referred Plaintiff at least four times to Defendant for treatment of his symptoms (Pltf's Decl. ¶ 8); and between September 8, 2011 and November 8, 2012, Plaintiff met with Defendant at least six times regarding his medical complaints (3ACP, ECF No. 23 at 23 ¶ 3). Defendant declares that, contemporaneous with seeing Plaintiff for his first medical visit on September 8, 2011, either just before he came into the examining room or at the same time, Defendant reviewed the medical records available to him. (Ogbuehi Decl. at ¶ 7.) Defendant also states that when he met with Plaintiff six times between September 8, 2011 and September 6, 2012 for medical visits, he discussed Plaintiff's complaints. (Ogbuehi Decl. at ¶ 15.) Thus, Defendant does not dispute that he knew Plaintiff suffered pain and other symptoms related to his spinal condition.

///

However, there is no evidence that Defendant was aware and drew the inference that Plaintiff was at substantial risk of serious harm if Plaintiff were not referred to a specialist to treat his spinal condition. Defendant knew that Plaintiff had been in a car accident in 1987 when he fell asleep at the wheel and went off an embankment and had a Harrington rod placed in his upper lumbar thoracic spine due to fracture of spine element and also a repair of the upper portion of the femur on the right side. (DUF 8.) Plaintiff's medical records show that no acute changes were seen in Plaintiff's medical condition by Plaintiff's medical providers before Defendant began treating Plaintiff, as shown by records of on a July 10, 2003 CT scan, a February 18, 2009 MRI, an October 25, 2010 x-ray, a February 4, 2011 CT scan, and a March 2, 2012 x-ray. (DUF 9-13, Exhs. B-E.) While Defendant was treating Plaintiff between September 2011 and November 2012, it was Defendant's medical opinion, and it is now, that there were no acute changes in Plaintiff's condition during the time he treated him based on Defendant's medical education, training and experience, findings from observations and physical examinations of Plaintiff, as well as review of his medical records and CDCR policies and procedures on pain management. (DUF 16 & 17.)

Plaintiff has not provided any evidence that Defendant knew that his condition placed him at a substantial risk of serious harm if he were not referred to a specialist. It is Plaintiff's opinion that his more recent symptoms indicated a spinal condition separate and apart from his prior condition relating back to injuries from the 1987 car accident. Plaintiff also believed that his symptoms indicated a neurological problem prompting him to request referral to an outside specialist in neurology. However, as a layman, Plaintiff may not offer the medical opinion that his new symptoms arose from a new, separate condition. Fed. R. Evid. 701. Plaintiff shows, at most, a disagreement between Defendant and himself about his treatment which is not sufficient to state a medical claim under the Eighth Amendment.

There is also no evidence that Defendant was deliberately indifferent to Plaintiff's serious medical needs or acted in violation of the standard of care applicable to medical professionals. Plaintiff offers evidence that at a follow-up visit on April 19, 2012, Defendant explained to him that if he (Plaintiff) had not "said anything about Ogbuehi's co-workers,"

Defendant would have investigated Plaintiff's "medical complaints." (3ACP, ECF No. 23 at 23:22-25.) Taking Plaintiff's account of the incident as true, such a statement by Defendant is unprofessional but without more does not show that Defendant acted with deliberate indifference to a known risk of serious harm to Plaintiff. Moreover, Plaintiff indicated that he did not want Defendant or another doctor at SATF to investigate his medical complaints because Defendant did not have training in diagnosing "neurological conditions" and there was no other doctor available at SATF with such training. (3ACP, ECF No. 23 at 23:26.) Plaintiff alleges, without supporting facts, that Defendant ignored his new symptoms of a medical condition that arose after 2010. In opposition to this allegation, Defendant provides copies of medical progress notes he wrote after each of six medical visits with Plaintiff documenting that Defendant noted Plaintiff's complaints, reviewed his medical history, took his vital signs, examined him, and adjusted his medication. There is simply no evidence that Defendant knew that Plaintiff was at risk of serious harm and ignored the risk.

Plaintiff provides evidence that in November 2013, after Defendant had stopped treating him, Plaintiff's spinal injuries separate from his prior spinal condition were diagnosed, and subsequently a neurosurgeon investigated Plaintiff's medical complaints and recommended surgery. (Pltf's Decl. at 35 ¶ 19.) However, even if Defendant should have, but did not conclude that Plaintiff's symptoms needed further investigation, this does not show deliberate indifference.

Based on the foregoing, the court finds that Defendant has proven an absence of evidence to support Plaintiff's deliberate indifference claim against Defendant for failing to refer him to a specialist for his spinal condition, and Plaintiff has not demonstrated that no reasonable trier of fact could find other than for him.

### ii.    Naproxen Prescription

There is no evidence that Defendant acted with deliberate indifference when he continued to prescribe the pain medication Naproxen to Plaintiff after Plaintiff reported blood in his stool. Plaintiff's lab results indicated that his platelets were abnormally reduced, which can indicate thrombocytopenia or internal bleeding. There is no evidence that Defendant

believed that Plaintiff was at substantial risk of serious harm by continuing to take Naproxen. In fact, the evidence shows that Defendant did not believe that Plaintiff suffered from internal bleeding

There is no dispute that on September 8, 2011, Defendant prescribed Naproxen to Plaintiff to alleviate his pain, (Ogbuehi Decl. ¶ 18; Pltf's Dec. at 30 ¶11); that on May 29, 2012, Defendant was notified of Plaintiff's lab result showing a marked decrease in Plaintiff's blood platelet level, (Ogbuehi Decl. ¶ 23; Pltf's Dec. at 34 ¶ 16); and that Defendant continued to prescribe Naproxen to Plaintiff until November 8, 2012, when he stopped the prescription, (Deft's Amd. Response to Pltf's Request for Adm., ECF No. 41 at 110:20-22; Pltf.'s Decl. at 35 ¶18).

Defendant's evidence supports his argument that Plaintiff never exhibited any signs or symptoms of internal bleeding. (DUF 19.) After prescribing Naproxen to Plaintiff on September 8, 2011, Defendant closely monitored Plaintiff's condition for signs or symptoms of internal bleeding. (Id.) On November 10, 2011, Plaintiff complained about hard stools but stated there was no blood in his stool, no abdominal pain, no nausea, no vomiting, and no indications of internal bleeding. (DUF 20.) On March 6, 2012, Plaintiff had a blood test that showed a platelet level of 231,000, which was within normal limits and does not indicate internal bleeding. (DUF 21.) On April 19, 2012, Plaintiff reported "seeing some tinge of blood in [his] stool," but had no other symptoms of internal bleeding. (DUF 22.) Plaintiff was given a fecal occult blood test and three more follow-up occult blood test cards to turn in, all which were negative for blood in the stool. (Id.)

On May 29, 2012, Plaintiff had a blood test that showed a platelet count of 40,000, which could indicate low platelets or lab error. (DUF 23.) Defendant suspected the May 29, 2012, platelet count of 40,000 may have been the result of lab error because Plaintiff did not have any signs or symptoms of internal bleeding, and it would be extremely rare for an individual's' platelet level to drop from 231,000 to 40,000 in less than three months, especially in the absence of anemia or other signs of bleeding. (Id.) On August 2, 2012, questioning the accuracy of the May 29, 2012 blood test, Defendant re-ordered a complete blood count, but

Plaintiff refused to take the blood tests. (DUF 24.) On August 9, 2012, Plaintiff refused to be examined but agreed to go to the lab, however there was no indication of bleeding. (DUF 25.) Defendant re-ordered the lab tests. (Id.) On August 16 through 18, 2012, Plaintiff refused his medication, and on August 17, 2012, Plaintiff was referred to Mental Health because he refused the medication. (DUF 26.) There was no sign that Plaintiff was suffering from internal bleeding. (Id.)

On September 6, 2012, Defendant stopped the Naproxen prescription because Plaintiff refused to take the blood test that would verify whether or not that low platelet count was real. (DUF 27.) On November 20, 2012, Plaintiff agreed to a blood test which showed a platelet level of 239,000 which was within normal limits. (DUF 29.) Defendant states that it was his medical opinion that Plaintiff was not suffering from thrombocytopenia because the only sign of possible internal bleeding was the May 29, 2012, lab test showing a 40,000 platelet level, and Defendant believed the lab test was an error. (DUF 32.) Defendant's medical opinion was that the benefit of continuing the Naproxen for Plaintiff outweighed the risks of potential side effects if the Naproxen was stopped. (Id.)

Plaintiff's evidence fails to show that he suffered from internal bleeding. There is no dispute that the May 29, 2012, lab report shows an abnormal platelet count of 40,000, or that Defendant's August 2, 2012 progress report refers to thrombocytopenia under the heading "Assessment – Diagnosis," or that Defendant's notes state, "Cont. Oxcarbazepine, Add Naproxen." (ECF No. 40, Exh. P.) Plaintiff presents Defendant's August 2, 2012, progress notes as evidence that Defendant diagnosed Plaintiff with thrombocytopenia but continued to prescribe Naproxen. (ECF No. 40, Exh. P; Pltf's Decl., ECF No. 41 at 34 ¶ 16.) However, Plaintiff, as a layman, may not interpret the meaning of Defendant's medical notes. Fed. R. Evid. 701. Moreover, Defendant declares that he did not made a diagnosis of thrombocytopenia, but rather that he was referring to the test result that showed a low platelet level, that he did not believe the test results were accurate and that he did not believe Plaintiff was suffering from thrombocytopenia. (ECF No. 44 at 9 ¶ 16.) Therefore, Plaintiff's evidence

///

does not support his claim that Defendant was deliberately indifferent in continuing to prescribe Naproxen.

Based on the foregoing, the court finds that Defendant has proven an absence of evidence to support Plaintiff's deliberate indifference claim against him for continuing to prescribe Naproxen to Plaintiff, and Plaintiff has not demonstrated that no reasonable trier of fact could find other than for him.

## IX.    CONCLUSION AND RECOMMENDATIONS

The court finds that Defendant has met his burden of demonstrating that under the undisputed facts, he is entitled to summary judgment against Plaintiff. Moreover, Plaintiff has not submitted admissible evidence showing the existence of a genuine issue for trial.

Therefore, **IT IS HEREBY RECOMMENDED that:**

1.    Plaintiff's motion for partial summary judgment, filed on September 11, 2017, be **DENIED;**

2.    Defendant's motion for summary judgment, filed on September 6, 2017, be **GRANTED;** and

3.    Summary judgment be entered in favor of Defendant, closing this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). **Within fourteen (14) days** from the date of service of these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be

///

///

///

///

///

///

served and filed **within ten (10) days** after the date the objections are filed. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __**May 23, 2018**__          _____**/s/ Gary S. Austin**__
                                          UNITED STATES MAGISTRATE JUDGE